**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**MALAYSIA WALTON**                                                      **PLAINTIFF**

**v.**                                                          **No. 3:20cv211-MPM-JMV**

**TUNICA COUNTY, MISSISSIPPI, DEPUTY**
**BRANDON SMITH (in his individual and official**
**Capacities), CAPTAIN WALTER FRENCH (in his**
**Individual and official capacities)**                          **DEFENDANTS**

<u>**ORDER**</u>

  This cause comes before the court on the motions of defendants Deputy Brandon Smith,

Captain Walter French, and Tunica County, Mississippi for summary judgment, pursuant to Fed.

R. Civ. P. 56.  Plaintiff Malaysia Walton has responded in opposition to the motions, and the

court, having considered the memoranda and submissions of the parties, is prepared to rule.

  This is, *inter alia*, a § 1983 excessive force action arising out of a June 29, 2019 dog

attack sustained by plaintiff after she was stopped by Tunica County deputies for running a red

light.  This court notes at the outset that ascertaining exactly what led up to the dog attack in this

case is made considerably more difficult by the fact that Tunica County did not equip the

arresting deputies in this case with body cameras.  As it happens, however, City of Tunica Police

Officer Phillip Keys was also on the scene, and, as a result of the City's decision to equip him

with a body cam, this court has a partial video record of the events in the case.  However, there is

a "gap" of video coverage lasting almost a minute which, unfortunately, includes the events

leading up to the attack and all but the last seconds of it.  This court notes that the video taken

prior to the coverage gap depicts a relatively calm scene, with plaintiff handcuffed and talking

with officers.  [Plaintiff's exhibit F].  The latter part of this first video clip also shows Deputy

Brandon Smith, a K9 officer, searching plaintiff's vehicle with his dog Blade, and neither dog nor handler appear, at this point, to be focused on plaintiff, who was standing handcuffed approximately ten yards away. *Id.*

The beginning of the second video demonstrates the final seconds of the dog attack, with Deputy Smith standing over a screaming plaintiff with the dog's collar in his hand. *Id.* A few seconds into the second video, Officer Keys is heard yelling a command to Deputy Smith to remove the dog from plaintiff. *Id.* Deputy Smith succeeds in removing the dog from plaintiff at this point, and it is a disputed issue of fact exactly how hard he had been trying to remove the dog prior to Officer Keys' command. In light of the gap in video coverage, there is no objective and precise proof regarding exactly how long it took Deputy Smith to remove the dog from plaintiff and how long the attack lasted in total. The gap in video coverage also means that the record evidence relating to the events leading up to the dog attack consists largely of the testimony of law enforcement officers.

The testimony of these officers is discussed in greater detail below, but this court notes that Deputy Smith testified that he intentionally dropped the leash on his dog while it was searching plaintiff's car for drugs and that it subsequently attacked plaintiff on its own volition. [Smith Depo. at 79-80]. In his deposition testimony, Smith noted his belief that his dog had been attracted to attack by the fact that, when plaintiff was informed by Tunica County Deputy Bobby Jefferies that she was being arrested based on prior warrants, she became "irate." [*Id.* at 86]. In their brief, defendants provide the following explanation for the dog's attack:

> As K9 Blade remained in his alert position next to the driver's window and Defendant Smith was photographing the vehicle's rear license plate, Deputy Jefferies began escorting Plaintiff to Jefferies's patrol car. As she was being escorted, Plaintiff inexplicitly [sic] fell into Deputy Jefferies and caused both Jefferies and Plaintiff to go to the ground. Perceiving that Deputy Jefferies was in distress, K9 Blade reacted by jumping on Plaintiff in an effort to protect Deputy Jefferies.

2

[Defendants' brief at 4 (record citations omitted).]

Defendants thus characterize plaintiff as having "fallen into Deputy Jefferies" while being escorted by him (which she denies), but they do not maintain that she committed any acts which would have warranted a dog attack. The dog's subjective motivations for the attack are, of course, unknowable, but Smith maintains that he acted with all due haste to bring it to an end. [*Id.*]. In her brief, plaintiff asserts that, as a result of the attack, she "remains left with deep tissue lacerations to her left breast, mental depression due to her deformed physical state because of the bite, and severe Post-Traumatic Stress Disorder due to the traumatic event." [Brief at 25]. In seeking recovery for these injuries, plaintiff maintains that fact issues exist regarding the true nature of Deputy Smith's actions in this case, and she argues that his summary judgment motion based on qualified immunity should be denied. Plaintiff further contends that disputed fact issues exist regarding her claim that defendants failed to secure proper medical care for her after the attack. This court will address these claims in turn.

1. **Conclusion 1: Genuine issues of fact exist regarding whether Deputy Smith committed a willful Fourth Amendment violation by permitting his dog to attack plaintiff.**

This court first addresses Deputy Smith's qualified immunity defense, as to the § 1983 claims asserted against him in his individual capacity. The Supreme Court and the Fifth Circuit have held that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)). An officer's good-faith assertion of qualified immunity at summary judgment shifts the burden of proof to the plaintiff to present evidence "(1) that the official violated a statutory or constitutional right, and (2) that the right

Case: 3:20-cv-00211-MPM-JMV Doc #: 145 Filed: 01/02/23 4 of 31 PageID #: 844

was 'clearly established' at the time of the challenged conduct." *Morgan*, 659 F.3d at 371

(*quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, (2011)).

　　While this standard is a stringent one, it should be emphasized that the mere fact that a

defendant is asserting a qualified immunity defense by no means serves to alter this court's

customary obligation to consider the summary judgment facts in the light most favorable to the

plaintiff, as the non-moving party. The U.S. Supreme Court made this clear in *Tolan v. Cotton*,

572 U.S. 650, 660, 134 S. Ct. 1861, 1868 (2014), where it wrote that:

> In holding that Cotton's actions did not violate clearly established law, the Fifth Circuit
> failed to view the evidence at summary judgment in the light most favorable to Tolan
> with respect to the central facts of this case. By failing to credit evidence that
> contradicted some of its key factual conclusions, the court improperly "weigh[ed] the
> evidence" and resolved disputed issues in favor of the moving party.

*Tolan*, 572 U.S. at 657. This court is thus obligated to show plaintiff its customary deference

with regard to issues of fact on summary judgment, notwithstanding the fact that the qualified

immunity standards are, in many other respects, quite favorable to defendants.

　　It is important to note that, in stating its view regarding whether an "unreasonable"

Fourth Amendment seizure would have been established under various factual scenarios in this

case, this court is performing the role required of it, and not a jury, under U.S. Supreme Court

precedent. Indeed, the Supreme Court has stated that "objective unreasonableness is a

question of law that can be resolved on summary judgment," *Mullenix v. Luna*, 577 U.S. 7, 11,

136 S. Ct. 305, 308 (2015), and, if video or other evidence made it clear exactly what transpired

in this case, then it would fall to this court to decide whether Deputy Smith's actions

constituted an objectively reasonable seizure under the Fourth Amendment. In actual fact, there

are many questions regarding what transpired in this case, and, for this reason, this court has

divided its order today into a discussion of the legal implications of various factual scenarios. It

4

will be for a jury to decide what actually happened in this case, but this court will, in this order, state its view regarding the legal implications of some of the most likely scenarios.

One potential avenue for plaintiff to establish a Fourth Amendment claim against Deputy Smith is to create fact issues regarding whether he ordered his dog to attack her. It seems clear that, from a legal perspective, this would be the clearest basis to hold Smith liable for a Fourth Amendment violation, *see, e.g. Gorman v. Sharp*, 892 F.3d 172, 174 (5th Cir. 2018)(noting that Fourth Amendment violations "must be willful"), but it is likewise apparent that, from a factual perspective, establishing jury issues in this regard is quite challenging for plaintiff. This is because, while Deputy Smith maintains that he intentionally dropped the leash on his dog while it was searching plaintiff's car for drugs, he insists that he never ordered his dog to attack her. Moreover, in light of the one-minute gap in video coverage of the arrest in this case, there is no definitive proof regarding what exactly transpired during the initial portion of the attack and the seconds leading up to it. Furthermore, plaintiff made no allegation in her complaint that an order to attack was given by Deputy Smith although, as discussed below, it seems clear from her briefing that her theory of the case in this regard has now evolved.

It is apparent that, in his briefing, Deputy Smith seeks to frame the Fourth Amendment issues in this case, to the extent possible, in the context of whether he gave his dog an order to attack. This court regards this line of argument as understandable, and frankly smart, since the factual hurdles faced by plaintiff in proving the existence of such an order to attack are so steep. This court concludes, however, that plaintiff has legal avenues for establishing Fourth Amendment liability against Deputy Smith which do not involve a specific order for his dog to attack. In so stating, this court notes that the Fifth Circuit wrote in a 2016 opinion that "we state only the obvious: under the facts in this record, permitting a dog to continue biting a compliant

and non-threatening arrestee is objectively unreasonable." *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016).

This court served as the trial court in *Cooper*, and while it recognizes that there are important factual differences between that case and this one, it believes that the Fifth Circuit's holding should apply equally to a dog attack which, all parties appear to agree, should not have begun in the first place. This court regards the word "permitting" to be a particularly important one in the Fifth Circuit's holding in *Cooper*, since it makes clear that a K9 officer may face Fourth Amendment liability for *willfully and consciously deciding not to take action* to stop an unwarranted dog attack and not merely for ordering such an attack in the first place. This court frankly does not believe that any explanation is necessary as to why permitting a dog to continue an unwarranted mauling of a suspect would be "objectively unreasonable," since the point seems self-evident. Indeed, while defendants maintain that plaintiff became irate and had "fallen into" Deputy Jefferies at the time she was attacked, there is no dispute that she was handcuffed and in no danger of either escaping or of causing harm to officers at the time.

It may be superfluous for this court to even mention these facts since, once again, defendants do not even attempt to argue that a dog attack would have been warranted under the facts here. That being the case, this court has little difficulty in concluding that *Cooper*'s holding that it should be "obvious" that "permitting" a dog to continue an unwarranted attack would be "objectively unreasonable" applies equally in this case. This court does agree with defendants that, to satisfy the Fourth Amendment intent standard, any decision by Smith not to take immediate action to stop his dog's attack must have been willful. Indeed, it is well settled that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement ... but only when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596–

6

97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (emphasis in original). A "[v]iolation of the Fourth Amendment requires ... [that the] detention or taking itself must be willful." *Id.* at 596, 109 S.Ct. 1378 (emphasis in original).

In concluding that fact issues exist as to whether Deputy Smith willfully permitted his dog's attack to continue longer than he should have, this court regards plaintiff's strongest evidence to be the second video, depicting the last seconds of the attack and, perhaps most crucially, Officer Keys' reaction to what he had been witnessing both before and after video coverage resumed. This court believes that this affirmative evidence must also be considered in the context of the *lack* of crucial evidence arising from Tunica County's decision not to equip its deputies with body cams. In so stating, this court emphasizes that the one-minute gap in video coverage means that only the last several seconds of the dog attack were recorded, and there is accordingly no way to know how quickly Deputy Smith reacted to the attack and how long it was allowed to continue in total. These are factual uncertainties which, it seems clear, must be resolved in plaintiff's favor at the summary judgment stage.

The gap in video coverage aside, this court believes that serious questions exist with regard to Deputy Smith's actions even on the portion of the attack which was recorded. In so stating, this court notes that the first few seconds of the video depict Deputy Smith standing above plaintiff with the dog's collar in his hand, but it is not clear (at least to this court) exactly how hard, if at all, he is trying to remove the dog from her. This is, once again, a factual uncertainty which must be resolved in plaintiff's favor at this stage. This court's suspicion that Deputy Smith might not have been acting with a full sense of urgency to bring the attack to an immediate end is strengthened by Officer Keys' emotional reaction to the attack, which was captured on video. In the video, Officer Keys can be heard yelling to Smith "Hey- get the motherfucker off!" with what strikes this court as being a tone of frustration and exasperation in

7

his voice.  Immediately after Keys spoke these words, Smith successfully removed the dog from its attack on plaintiff, even though he had not done so in the seconds prior to Keys' command.

In the court's view, the simple fact that Officer Keys felt it necessary to shout such a command to Deputy Smith in the first place is a highly significant one in this case.  Indeed, it strikes this court as unlikely that a Tunica Police Officer would shout a command at a Tunica County deputy regarding how he should be doing his job, if he felt that he was doing that job already.  Moreover, this court believes that the fact that Officer Keys chose to use profanity in shouting his command to Deputy Smith, and the emotional tone in his voice, give plaintiff an even stronger basis to argue that Keys witnessed things, both before and after the video coverage resumed, which reflected a willful failure on the part of Smith to bring his dog's attack to a rapid conclusion.  In the court's view, the probative value of this video evidence is made even greater by the fact that it captures Officer Keys' real-time reactions to the attack.  Indeed, the Federal Rules of Evidence regard such evidence of "present sense impressions" as being so inherently reliable that it forms its own exception to the hearsay rule.  *See* FRE 803(1).   In the court's view, such evidence is, quite arguably, more valuable than even deposition testimony, since there are no questions regarding whether the statements in question were influenced by a deponent officer's desire not to implicate a fellow police officer.

It is for a jury to determine exactly what emotions Officer Keys' tone of voice in the video conveys, but, once again, it strikes this court as being one of frustration and exasperation that the attack was allowed to continue for as long as it was.  In his deposition, Keys testified that he "screamed for the K9 handler to get that dog off of her" because "she didn't need to be bit," [depo. at 20] but he stopped short of saying that he regarded Deputy Smith's reaction to the attack as inadequate.  Still, it strikes this court as entirely proper for plaintiff to argue that Officer

Keys' tone of voice in the video reflected a belief that he did not, at the time, regard Smith's response to the attack as adequate, and it anticipates that she will so argue at trial.

A final reason why this court regards the second video as crucial evidence lies in the fact that, to reiterate, Deputy Smith managed to remove the dog from the attack immediately after he was ordered to do so by Keys. Indeed, the video depicts Deputy Smith standing over plaintiff with the collar in his hand for a few seconds before Keys' shouted command is heard, and the dog's being removed coincides precisely with the command being spoken. This strengthens this court's suspicion, from watching the video, that Deputy Smith might not have been doing all that he could to remove the dog from its attack until Officer Keys ordered him to do so. Once again, this court believes that even a few seconds of being unnecessarily mauled by a police dog would be a significant constitutional injury, and its review of the video evidence leads it to conclude that fact issues exist regarding whether Smith subjected plaintiff to such an injury by allowing the attack to continue too long.

In light of the foregoing, this court concludes that genuine fact issues exist regarding whether Deputy Smith made a willful and conscious decision not to take all reasonable steps to bring his dog's attack to a rapid conclusion, regardless of whether he ordered the dog to attack in the first place. This court can discern no reason why the issue of whether Smith acted with such an intent should be taken from the jury, particularly considering the deferential qualified immunity factual review standards and the absence of video coverage of some of the most crucial events in this case. In so stating, this court believes that it would be highly questionable, from a public policy standpoint, if a municipality such as Tunica County could, by deciding not to equip its deputies with body cameras, thereby manufacture a situation in which courts had no choice but to accept the testimony of its deputies regarding their actions in cases where members of the public sustained grievous attacks.

9

Even assuming, for the sake of argument, that *Cooper* is insufficient to "clearly establish" the law in this regard, this court believes that this situation is an appropriate one for the application of the "obvious case" exception to the requirement that the plaintiff "clearly establish" the law in a specific factual context. *See Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508 (2002). The *Hope* exception is not frequently applied, presumably because most cases are not "obvious" ones. Still, this court has applied the exception in appropriate cases, and it notes that the Fifth Circuit recently agreed with its decision to do so in another § 1983 case. *See Harris v. Clay Cnty., Mississippi*, 47 F.4th 271, 279 (5th Cir. 2022).[1]

While this court recognizes that *Hope* should be applied sparingly, it considers it to be a highly important exception to the exceedingly stringent showing of prior precedent which applies in most qualified immunity cases. Indeed, if this exception did not exist, then defendants might feel at liberty to engage in a wide variety of obviously unconstitutional conduct which had not yet been declared unlawful by a sufficient amount of federal appellate authority. It also seems clear that there must be some mechanism for plaintiffs to "break through" the general requirement of prior precedent, lest the law end up essentially frozen in place, with little potential for development based on novel fact patterns or evolving law enforcement practices.

This court concludes, based on *Hope*, that it should have been patently obvious to any K-9 officer who had willfully relinquished control of a dog which then initiated an unjustified attack on a suspect that the Fourth Amendment did not allow him to make a conscious decision, even for a few seconds, not to take immediate action to bring the unjust attack to an end. In so

---

[1] This court notes that it raised the *Hope* exception on its own motion in *Harris*, as it has done in this case. If Deputy Smith should file an interlocutory appeal in this case, then the Fifth Circuit will lack jurisdiction to consider the "genuineness" of disputed fact issues, but it will consider issues of law *de novo*. *See Byrd v. Cornelius*, 52 F.4th 265, 270 (5th Cir. 2022). This court presumes that plaintiff would argue in favor of *Hope*'s applicability in addressing these issues of law on any interlocutory appeal.

stating, this court notes that the Supreme Court has been most willing to apply *Hope*'s "obvious case" exception in cases involving fact patterns where a plaintiff suffered an unjustified violent or sadistic attack.[2] This court further reiterates that, in *Cooper*, the Fifth Circuit wrote "we state only the obvious: under the facts in this record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." *Id.* at 524. It is unclear whether the Fifth Circuit's use of the word "obvious" in this context was a signal that *Hope* should, in its view, apply in this context, but this court certainly believes that it should. This court therefore concludes that *Hope* would permit plaintiff to survive the "clearly established" prong of the qualified immunity defense if Deputy Smith willfully failed to take reasonable steps to bring his dog's attack to an immediate end. This court further concludes that genuine fact issues exist regarding whether Deputy Smith did, in fact, willfully fail to take such steps, and qualified immunity is due to be denied on this issue.

### 2. Conclusion 2: Plaintiff has established fact issues regarding whether Deputy Smith ordered his dog to attack her.

This court now turns to the issue of whether plaintiff has managed to establish fact issues regarding whether Deputy Smith ordered his dog to attack her in this case. As to this issue, this court will limit its analysis to the facts of this case since, by its understanding, defendants do not contest that any order by Deputy Smith for his dog to attack plaintiff would have been unlawful.

---

[2] This was the case in both *Hope* and the Supreme Court's recent decision in *Taylor v. Riojas*, 141 S. Ct. 52 (2020).

While this court frankly believes that plaintiff's strongest factual basis for asserting Fourth Amendment liability against Deputy Smith is set forth in the previous section, it recognizes that, under *Tolan*, it must consider the facts in the light most favorable to plaintiff, as the non-moving party.

Of course, the crucial (and often unclear) issue in this context is "how much" factual deference to the plaintiff's case is appropriate, and this is a subject regarding which reasonable judges can disagree. Regardless, this court reiterates that it is Tunica County's decision not to equip their deputies with body cams which has left the factual record so unclear in this case, and, under these circumstances, it would arguably be improper to give too much credence to the self-serving deposition testimony of law enforcement officers regarding the actions they took away from a camera's watchful eye.

These considerations aside, it would clearly be improper to characterize plaintiff's ability to establish the existence of an attack order by Deputy Smith as the *sine qua non* of this lawsuit, since Smith will (barring reversal by the Fifth Circuit) be facing trial regardless, in light of this court's ruling in the previous section.  This court further concludes that, since jurors will be deciding whether Deputy Smith committed a willful Fourth Amendment violation in this case, it would likely confuse them to issue partial peremptory instructions under specific fact patterns, such as whether he ordered his dog to attack.  In the court's view, it makes far more sense to properly instruct the jurors regarding plaintiff's burden of proving a willful Fourth Amendment violation on the part of Deputy Smith and to allow them to decide whether such a violation has been established under *any* fact pattern.

With these considerations in mind, this court notes that defendants maintain, based on plaintiff's complaint, that she does not even contend that Deputy Smith ordered his dog to attack

her. While this may have been true at one time, plaintiff makes it clear in her summary judgment brief following discovery that:

> While the parties have a genuine dispute whether Deputy Smith intended to deploy K9 Blade to bite Ms. Walton, it is undisputed that Deputy Smith intended to deploy K9 Blade; he intentionally released K9 Blade's leash during active deployment, and he intentionally did not terminate the deployment before Ms. Walton was bitten. All in clear violation of Tunica County's law enforcement policy and procedure. Deputy Smith admitted that K-9 Blade responds to his commands only. See *Smith Depo.*, Pg.154, Lns.10-14. Taking the facts in the light most favorable to Ms. Walton, a jury could find that an on-scene officer, more likely than not, commanded K9 Blade to attack Ms. Walton verbally or nonverbally by mere deployment and that deployment was intentional. Only the finder of fact, a jury, can decide whether Deputy Smith intended to deploy his canine based on the facts and video, that he did deploy said K9 with a command to bite, and that he intentionally and willfully relinquished positive control of said K9.

[Plaintiff's brief at 14-15].

Plaintiff thus asserts that "[o]nly the finder of fact, a jury, can decide whether Deputy Smith intended to deploy his canine based on the facts and video, that he did deploy said K9 with a command to bite, and that he intentionally and willfully relinquished positive control of said K9." [*Id.*] In so arguing, plaintiff emphasizes that City of Tunica police officer Keys testified in his deposition "that he heard Deputy Smith give commands to the K9 officer before Deputy Smith approached Ms. Walton; however, he did not understand what commands were given." [Brief at 4].

It is thus apparent that plaintiff now maintains that fact issues exist regarding whether a command to attack was given by Smith, and it would be incorrect to state otherwise. This does appear to constitute an evolution of plaintiff's theory of the case, but it strikes this court that, in their briefing, defendants exaggerate the extent to which this is the case. For example, defendants provide what appears to be an inaccurate description of plaintiff's deposition testimony on this issue, writing in their brief that "[p]laintiff testified that neither Deputy Smith, nor anyone else, commanded K9 Blade to bite her." [Brief at 4]. In reality, while plaintiff did

acknowledge that her "lawsuit" included no allegation that Deputy Smith ordered his dog to bite her, she testified in her deposition that:

> Q. Okay. Do you contend in this lawsuit that either Mr. Smith -- Officer Smith, the K-9 officer, or anybody else, gave the dog a command to come after you? Are you making that allegation in this lawsuit?
> A. No. I don't know why the dog came towards me. I'm not saying that he did. I can't say that he didn't. I didn't see him physically say come and get me, or whatever the command to come and get me. But, no, I'm not making that allegation.

[Depo. at 90-91]. Plaintiff thus made it clear that she "can't say" that Deputy Smith didn't order his dog to come towards her, and defendants' characterization of her testimony thus seems, at best, incomplete. Moreover, it is undisputed that Deputy Smith issued commands to his dog in a foreign language used by dog handlers, and it thus strikes this court as quite unrealistic to expect plaintiff to serve as a reliable witness regarding whether Smith ordered his dog to attack her.

In her summary judgment briefing, plaintiff has provided this court with her current allegations as it relates to Deputy Smith's actions, and it does not seem improper that she would take the position that, while she has no direct evidence of an order to attack her, it is within the province of a jury to disbelieve Deputy Smith's testimony and to infer that a command to attack was given. Moreover, while it may well be true that plaintiff's theory of this case has evolved since its initial filing, this is an entirely predictable occurrence in any civil lawsuit. This court does conclude that plaintiff should file an amended complaint to reflect her current theory of the case, and it directs that she do so. However, this court will not accept defendants' urgings that plaintiff be locked into the allegations of her complaint, since the Federal Rules of Civil Procedure provide for liberal amendments of pleading precisely in order to allow a plaintiff's theory of a case to develop. *See* Fed. R. Civ. P. 15.

In their reply brief, defendants argue that plaintiff is taking Officer Keys' testimony out of context, insisting that it is clear from his testimony as a whole that he was merely stating that

14

he heard Deputy Smith give commands to the dog after the attack began. In so arguing, defendants themselves provide their own selective quotations of Keys' testimony, namely by omitting his statement that, when he turned around and heard Deputy Smith give commands to the dog, Smith was not near plaintiff. [Reply brief at 6].

As stated by Keys in his deposition:

Q. Okay. Do you know whether or not you heard the K9 officer make any commands to the dog?
A. Yes, ma'am.
Q. Okay. Do you recall what you heard?
A. No, ma'am. I don't recall exactly what he was saying.
Q. Do you recall how many commands were given?
A. No, ma'am.
Q. All right. So by -- when you turned around, you heard commands --
A. Yes, ma'am.
Q. -- is that correct?
Q: When you turned around, was the K9 officer near Ms. Walton?
A. No, ma'am.
Q. And when I say, K9 officer, let me -- let me clarify because I think I'm using them interchangeably. Let me make sure you -- I don't confuse you. Okay?
11 A. (Witness nodded head affirmatively).
Q. When you turned around, was the K9 handler near Ms. Walton?
A. No, ma'am.

[Keys deposition at 22].

This court's reading of Officer Keys' testimony is that he did not clearly state one way or the other whether he heard Smith give unspecified commands to his dog before or after it attacked, since none of the deposing attorneys asked him sufficiently precise questions in this regard. Officer Keys did clearly state, however, that, he heard commands when he turned around and that, at that point, Smith was not near plaintiff. Clearly, this is testimony which is helpful to plaintiff's version of events, since, while not definitive, it tends to make it more likely that the commands in question occurred before the attack than if Keys had testified that Smith had already reached plaintiff (and his dog) when he gave the commands. Moreover, while it does

15

appear more likely that any commands which Keys heard *after* he turned around would have been given after the attack began, he never testified that the *only* commands which he heard were those which occurred after he turned around.

This court wishes to be clear, at this juncture, that it views defendants' contention that Deputy Smith never gave his dog an order to attack as being a quite plausible, perhaps even likely, proposition. Defendants are well aware, however, that this is not good enough in the summary judgment context, since the factual standard of review at this stage is so deferential towards the plaintiff. Moreover, it appears to this court that defendants attempt to "oversell" Keys' testimony, such as when they argue that "any uncertainty as to what commands were given is dispelled by Plaintiff's own expert, who explained that Deputy Smith 'used the word foy. Foy is a no command." [Reply brief at 6].

Plaintiff's expert was not on the scene of the actual events and, that being the case, the only way he would be able to offer first-hand testimony regarding what commands were given by Deputy Smith is by watching the video of the incident. Given the one-minute gap in coverage, however, the video begins with the dog already attacking plaintiff and Deputy Smith standing above her with the dog's collar in his hand. That being the case, it logically follows that the "foy" command heard by plaintiff's expert would have been made after the initial commands referenced by Keys, since those were made, according to him, at a point when Smith was not near plaintiff.

While this court has discussed Officer Keys' deposition testimony at some length, it wishes to be clear that its ruling today is not based primarily upon his less-than-perfect recollection of events. Indeed, this court does not regard Officer Keys' testimony as being a

"home run" for either side, and it appears that both plaintiff and Deputy Smith will be able to use portions of it to their advantage.

This court now turns to the facts of this case which it *does* regard as most significant on the "attack order" issue. In concluding that triable fact issues exist regarding whether Deputy Smith ordered his dog to attack, the starting point for this court's analysis lies in the facts that, as all parties appear to agree, 1) K9 Blade was, at all relevant times in this case, Smith's responsibility to control and 2) notwithstanding this responsibility, the dog committed a grievous and unwarranted attack on plaintiff. In the court's view, these two facts place a factual burden upon Smith to explain exactly how a dog in his control came to commit such an unjustifiable attack. Moreover, to the extent that defendants' factual defenses are based on Deputy Smith's own self-serving testimony (or that of his fellow deputies), then it strikes this court that a jury is by no means required to believe such testimony.

This court submits that, to the extent that Deputy Smith's testimony is deemed by jurors to be less than credible, then they would be justified in concluding that the attack was, in fact, carried out in accordance with his orders. In their briefing, defendants insist that plaintiff has no evidence that Deputy Smith ordered his dog to attack, but this court concludes that, to the extent that credibility issues exist regarding his version of events, then those issues may themselves support an inference that the dog acted based on his orders. In so stating, this court submits that the default assumption, when a K9 officer shows up on an arrest scene with a deployed dog, is that whatever actions that dog takes on that scene were in accordance with the handler's orders. Certainly, this assumption may be definitively rebutted in a particular case, such as if video evidence of the arrest clearly demonstrates, to use one hypothetical, that the dog escaped his handler's control while chasing a squirrel and thereupon attacked the suspect on his own

17

volition. In such a scenario, it might be argued that the officer was negligent in letting his dog

escape, but the plaintiff would have a poor argument that a willful Fourth Amendment "seizure"

had occurred.

 That brings this court to the crucial fact that, in this case, the video evidence taken

directly before the one-minute gap in coverage shows K9 Blade leashed and fully under Deputy

Smith's control, while searching plaintiff's vehicle. That being the case, there is no video

evidence supporting Deputy Smith's version of events, namely that he dropped his dog's leash

while searching plaintiff's vehicle and that the dog later bolted towards plaintiff and attacked her

on its own accord. In explaining how this came to pass, Smith testified in his deposition that,

while conducting a search of plaintiff's vehicle, his dog "sat down indicating his alert to --

positive alert to narcotics." [Smith Depo. at 79]. In justifying his decision to drop the dog's

leash at this point, Deputy Smith testified that:

> Q: Once there's an alert, what do you do?
> A: What I do is I would place my leash on the ground while the K9 is posed. This a
> practice of mine that I've done for a long time while I had Blade. I take evidence photos
> of the vehicle while the K9 is posed on the vehicle. I -- what I mean by, posed, is while
> he's sitting on the vehicle.
> That way if anyone ever tries to say, oh, you made him do that; no, I didn't. I never tell
> the dog to, sit. I never tell him to, stay. He'll do that on his own. Also, I take my evidence
> photos of him while he's posed on the vehicle. That way I can say -- they can't -- no one
> can ever tell me, the dog didn't alert. Well, then what's this?

[*Id.*].

 Deputy Smith thus explained his decision to drop the dog's leash based not on written

law enforcement guidelines, training manuals or other objective sources, but, rather, his own

idiosyncratic practices which, quite frankly, strike this court as suspect. Indeed, it is this court's

view that ensuring that he has control over a dangerous animal should be a higher priority for a

K9 officer that attempting to pre-emptively rebut a hypothetical allegation that he was

fabricating evidence. This court is not alone in finding Smith's alleged practices in this regard
questionable, since Officer Keys testified in his deposition that:

> Q. Based on your experience as an officer, do you believe letting the leash go was
> reasonable?
> A. No, ma'am.

[Keys depo. at 44-45]. It is, in this court's experience, quite uncommon for police officers to
criticize the actions of their fellow officers during depositions, and jurors may regard the fact that
Officer Keys did so here as significant evidence in plaintiff's favor.

Ultimately, the present issue for this court is not whether Deputy Smith negligently
decided to drop the leash on his dog during his search of plaintiff's vehicle, but, rather, whether
he committed a willful Fourth Amendment seizure of plaintiff by ordering his dog to attack.
While it may be true that plaintiff lacks substantial *direct* evidence that Deputy Smith ordered his
dog to attack, this court believes that jurors could reasonably infer that such a command was
given based on 1) Smith's ultimate responsibility to control his dog and 2) their disbelief of his
explanations regarding how he came to lose such control. As to the second point, this court
believes that the fact that Deputy Smith cited, as the reason for his actions, his own idiosyncratic
practices which were questioned even by his fellow police officer, might reasonably lead jurors
to question whether his version of events actually happened. This is particularly true considering
that, once again, Tunica County did not equip him with a body cam which likely would have
provided definitive proof regarding his actions.

Even considering Tunica County's responsibility for the gap in video coverage, this
court acknowledges that it seems highly implausible that Deputy Smith would have simply
ordered his dog to attack "out of the blue" without at least some provocation on plaintiff's part.
Once again, the video footage prior the one-minute gap in coverage shows Deputy Smith and his

dog searching plaintiff's car for drugs, and both handler and dog appear to be calm and focused on the vehicle at that point in time. It is, in the court's view, highly implausible that Deputy Smith would have simply ordered his dog to attack plaintiff out of the blue during this portion of the arrest. Defendants allege, however, that, at some point during the "gap" in video coverage, Deputy Jefferies told plaintiff that he was putting her under arrest and that, in response, she became irate. As described by Jefferies in his declaration:

> I advised the female identified as Malaysia Walton of her warrants and that she was being arrested. I attempted to escort the female to my patrol unit and she continued to refuse orders given to her and continued her irate behavior. She stated several times that she was pregnant. She continued to pull away from me and refused to walk. Once getting in the area where Deputy B. Smith and K-9 Blade were working, her irate behavior escalated. She shifted her body weight and dropped to the ground, pulling me down with her. K-9 Blade turned and witnessed me pulling suspect Walton and attacked.

[Jefferies statement at 1]. Deputy Jefferies thus stated that, at the time plaintiff was attacked, she was irate and refusing to obey orders, and it does not strike this court as implausible that Deputy Smith would have ordered his dog to attack during this period. Of course, Jefferies did not testify that he heard any such command, but, in the absence of video footage, this court does not believe that jurors are required to believe the testimony of Tunica County deputies in this regard.

In light of the foregoing, this court concludes that triable jury issues exist regarding whether Deputy Smith ordered his dog to attack. While this court's conclusion in this regard is based on the factors discussed above and not "fairness" considerations, it wishes to briefly address Smith's contention that it would be unduly burdensome to subject him to a trial by jury. This court rejects any such unfairness arguments, considering that Smith's dog attacked a handcuffed suspect during a time when that dog was his responsibility to control, and it is clear from the video that plaintiff suffered greatly as a result of Smith's failures in this regard. It thus seems clear that, even under Smith's version of events, plaintiff suffered a grievous dog attack

20

because of his actions, and this court can discern no unfairness in requiring him to explain his actions to a jury. In so stating, this court emphasizes that nothing in its order today imposes liability against Deputy Smith; it simply concludes that jurors should decide whether such liability exists. This court therefore concludes that fact issues exist regarding whether Deputy Smith ordered his dog to attack, and, since it seems clear that such would have been unlawful, Smith's qualified immunity motion is denied regarding this issue.

### 3. Conclusion 3: Captain French is entitled to qualified immunity as to the failure to intervene claims against him.

This court now turns to plaintiff's failure to intervene claim against Captain French.[3] It is well established that an officer is liable for failure to intervene when that officer: (1) knew a fellow officer was violating an individual's constitutional rights, (2) was present at the scene of the constitutional violation, (3) had a reasonable opportunity to prevent the harm but nevertheless, (4) chose not to act." *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020). "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). "An officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983" under a theory of bystander liability." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).

---

[3] This court notes that, while plaintiff's brief makes reference to the liability of "defendant officers" in this context, a bystander liability claim makes no sense as asserted against Deputy Smith, since he was the officer alleged to have used excessive force. This court's order will accordingly only address the failure to intervene claim against Captain French.

In considering plaintiff's bystander liability claims, this court notes at the outset that her briefing does a poor job of making specific factual allegations as to what Captain French's opportunity to intervene to stop the attack was and how he failed in this regard. In their brief, defendants write that "the record reflects that Defendant French was at his patrol unit speaking on the phone with Plaintiff's aunt when the incident occurred," and plaintiff does not appear to contest this assertion. [Brief at 13]. Moreover, plaintiff's brief relies upon vague generalities regarding what Captain French was doing during the attack, and she simply asserts that fact issues exist regarding his liability, instead of clearly demonstrating why such is the case. For example, plaintiff writes in her brief that:

> Captain French argues that there was no time or opportunity for them to intervene and that Deputy Smith was already removing Officer Blade from Ms. Walton once he saw the attack. These arguments fall into the category of factual disputes that a jury must decide, and the video evidence exposes, rather than expunges, the disputed facts. The record shows that Captain French interacted with Ms. Walton prior to the attack. The video shows Deputy Smith with his hand on K9 Blade's collar as K9 Blade continued attacking Ms. Walton. Captain French admits that he saw Deputy Smith with his hand on the collar as K9 Blade attacked and did not go intervene, although he was familiar with K9 Blade as a previous owner.

[Brief at 22-23].

In the court's view, none of these arguments are particularly helpful to plaintiff in making out a failure to intervene claim against Captain French. In so stating, this court notes that the fact that French "interacted with Ms. Walton prior to the attack" is completely irrelevant for purposes of her failure to intervene claim, and none of her arguments rebut his assertion that he was too far away to stop the attack. Accordingly, while this court has shown considerable deference to plaintiff in its factual findings in this order, it concludes that, even under a deferential standard of review, her briefing fails to establish fact issues regarding any bystander liability claim against Captain French.

Even if this court were to grant plaintiff the benefit of the doubt regarding the existence of fact issues in this regard (which it does not), it would still conclude that she had failed to

"clearly establish" the law in this context. In so stating, this court notes that, in the Fifth

Circuit's 2002 decision in *Joseph v. Bartlett*, cited above, the Fifth Circuit found qualified

immunity applicable as to failure to intervene claims based on the plaintiff's failure to meet the

"clearly established" prong. *Joseph*, 981 F.3d at 344-45. In so holding, the Fifth Circuit wrote

that:

> Plaintiffs have the burden to demonstrate that the law was "clearly established"—
> that, as of February 7, 2017, the date of their encounter with Joseph, any reasonable
> officer would have known that the Constitution required them to intervene. And we
> cannot deny qualified immunity without identifying a case in which an officer acting
> under similar circumstances was held to have violated the Fourth Amendment, and
> without explaining why the case clearly proscribed the conduct of that individual officer.

> Plaintiffs do not identify a single case to support the argument that any reasonable
> officer would have known to intervene under these circumstances. We make no comment
> on whether Plaintiffs could have done so—the record in this case simply shows that they
> have not done so. In fact, they do not make any arguments as to the clearly established
> law. Nor do they argue that this case is obvious as to these nine officers. The officers
> don't identify cases or make arguments either, but that is not their burden.

*Id.* at 345.

The same could be said for the briefing in this case. In so stating, this court notes that the

legal authorities cited in the first paragraph of this section were taken verbatim from plaintiff's

brief, and, in attempting to meet the "clearly established" prong, she relies upon that authority,

writing that "the above- mentioned legal argument and caselaw establish that [plaintiff's] treatment

in May 2019 amounted to excessive force, unreasonable seizure and, in other words, an underlying

constitutional violation." [Plaintiff's brief at 21].

In relying upon these general principles of bystander liability, rather than on case law

closely on point, plaintiff has committed the error which has doomed countless constitutional

claims under the qualified immunity analysis. As noted by the Fifth Circuit in a recent decision:

> "[A] right is clearly established only if it is sufficiently clear that every reasonable
> official would have understood that what he is doing violates that right." *Betts v.
> Brennan*, 22 F.4th 577, 584 (5th Cir. 2022) (cleaned up). The right must be framed "with

specificity and granularity," *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019), not "at a high level of generality," *Betts*, 22 F.4th at 584 (citation omitted). Accordingly, qualified immunity shields officers "unless existing precedent 'squarely governs' the specific facts at issue," *Kisela v. Hughes*, —— U.S. ——, 138 S. Ct. 1148, 1153, 200 L.Ed.2d 449 (2018) (citation omitted), such that the question has been placed "beyond debate," *Ashcroft*, 563 U.S. at 741, 131 S.Ct. 2074.

*Laviage v. Fite*, 47 F.4th 402, 408 (5th Cir. 2022).

In her brief, plaintiff has not even attempted to cite authorities "clearly establishing" the scope of an officer's Fourth Amendment duty to intervene when a dog who should be under the control of a K9 officer attacks a suspect. Moreover, this court does not regard this as a proper context for the application of the "obvious case" exception, since the fact that there was, in fact, a trained K9 officer on the scene made it less than obvious to an officer in Captain French's position whether he should intervene personally or let the dog's trained handler bring an end to the attack. In so stating, this court notes that even Officer Keys testified that he did not try to remove the dog because "I didn't want to get bit, for one, and, two, the -- I -- the dog wasn't going to -- he wasn't going to listen to me no way." [Keys depo. at 21]. Under these circumstances, this court would be hard pressed to find it "obvious" that French should have intervened, when even Officer Keys (who was clearly sympathetic to plaintiff's plight) deemed it inappropriate to do so. This court accordingly concludes that plaintiff has failed to establish the second prong of the qualified immunity standard as it relates to her failure to intervene claim against Captain French, and he is therefore entitled to dismissal of this claim on summary judgment.

### 4. Conclusion 4: Deputy Smith and Captain French are entitled to qualified immunity as to plaintiff's failure to provide medical treatment claim.

This court next addresses plaintiff's claims against Deputy Smith and Captain French based on their alleged failure to properly secure her medical treatment after the dog attack. In the court's view, plaintiff's arguments on this issue suffer from the same weaknesses discussed in the previous section, inasmuch as she relies, once again, on generalized principles of law, rather than case law closely on point, in attempting to meet the "clearly established" prong of the qualified immunity standard. For example, plaintiff argues in her brief that:

> "The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by police is entitled to medical care." *Carter v. Reach*, 399 Fed. Appx. 941, 942 (5th Cir. 2010). "Officers violate that right if they are deliberately indifferent to a serious illness or injury. A showing of deliberate indifference requires a showing that the defendant subjectively knew of substantial and significant risk and that he effectively disregarded that risk." *Jacobs v. West Feliciana Sheriff's Dep't.*, 228 F.3d 388, 395 (5th Cir. 2000). To establish a claim of deliberate denial of medical care, the plaintiff "must show that the defendant: (1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'drew the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (brackets omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970 (1994)).

[Brief at 24].

While plaintiff's citations to general legal principles in this context are correct, they are, once again, insufficient to establish that Deputy Smith and Captain French should have known, based on clearly established law, that their specific conduct in this case was unlawful. In so stating, this court notes that plaintiff's failure-to-treat claims are significantly weakened by the fact, which she acknowledges, that an ambulance was called to the scene and treated her after the attack. [Brief at 5]. While plaintiff maintains that she should have been sent to the hospital for treatment, it seems clear that her heavy burden of creating fact issues regarding deliberate indifference on the part of Smith and/or French is made significantly more difficult by the fact that paramedics were called and provided treatment on the scene.

Additionally, this court notes that plaintiff fails to fully engage with defendants on their factual arguments in this context. In their brief, defendants write that:

25

At the outset, Defendants note that Plaintiff fails to even allege that Defendant Smith or Defendant French deliberately disregarded Plaintiff's serious medical needs.4 Nonetheless, the proof here negates any inference that Defendant Smith or Defendant French acted with deliberate indifference. There is no evidence that either of these Defendants refused to treat Plaintiff, ignored her complaints, or engaged in any conduct that would clearly evince a wanton disregarded for her serious medical needs. To the contrary, it is undisputed that an ambulance was immediately requested after Plaintiff was bitten and arrived on scene in less than ten (10) minutes. See Ex. B at 116:11-15; see also Ex. D at 21:11-13; Ex. F. Likewise, it is undisputed that Plaintiff received medical treatment at the scene and then cleared by EMTs. See Ex. A at 80:14-20; see also Ex. D at 56:13-57:1. The EMTs never advised that Plaintiff needed to be transported to the hospital for further treatment. See Ex. D at 56:13-57:1. Despite this being undisputed, Plaintiff contends that "the treatment that they gave me, I don't feel that it was right." See Ex. A at 80:25-81:1. Plaintiff's disagreement with the medical treatment that she received is not sufficient to support her instant claim. See Gibbs, 254 F.3d at 549.

In the case at bar, Plaintiff cannot show that Defendant Smith or Defendant French was subjectively aware that Plaintiff needed additional treatment beyond what she received from medical personnel at the scene. Thus, Plaintiff cannot show that Smith or French deliberately disregarded any serious medical needs of Plaintiff. Because Plaintiff cannot show a deliberate denial of medical care by Smith or French, Plaintiff cannot establish a violation of a clearly established right. As a result, Defendant Smith and Defendant French are entitled to qualified immunity from Plaintiff's claim that she was denied medical care.

As to any claim for delayed medical treatment while Plaintiff was at the Tunica County Jail, there is no evidence that Defendant Smith or Defendant French had any further interaction with Plaintiff after she was transported from the scene. Additionally, Plaintiff has not sued any individuals from the jail that allegedly caused a delay in medical treatment. Nonetheless, the record reflects that after Plaintiff submitted her request for medical services, she received medical treatment the next morning. See Ex. I.

[Brief at 15-16]

This court regards these as strong factual arguments in favor of defendants' qualified immunity motions, and it does not believe that plaintiff has succeeded in casting doubt upon them. In so stating, this court notes that plaintiff's brief repeatedly makes reference to the actions of "Tunica County" and/or "deputies on the scene,"[4] and she fails to sufficiently tailor her arguments to the knowledge and actions of Deputy Smith and Captain French. Moreover, plaintiff relies heavily upon her own self-serving testimony and that of her expert regarding what

---

[4] *See, e.g.* plaintiff's brief at 25-26, stating that "[e]vidence asserts that Tunica County refused to allow EMS services to provide further medical attention to Ms. Walton."

an officer on the scene "should" have known, but such evidence strikes this court as insufficient to cast doubt upon the strong factual arguments raised by defendants.

Even if this court were to (generously) conclude that fact issues exist regarding the actions of Deputy Smith and Captain French in securing plaintiff adequate medical attention, the fact would still remain that plaintiff has failed to cite case law sufficiently on point to "clearly establish" that the actions of these two officers were unlawful. The qualified immunity motions of these two defendants will therefore be granted as to the failure to treat claims against them.

5. **Conclusion 5: Plaintiff has failed to establish genuine fact issues regarding Tunica County's municipal liability for the dog attack in this case.**

This court now turns to plaintiff's claims seeking to hold Tunica County liable under § 1983 for the dog attack in this case. These municipal claims include those asserted against Deputy Smith and Captain French in their official capacities, since plaintiff acknowledges that such official capacity claims are tantamount to claims against the County itself. [Brief at 28, citing *Leatherman v. Tarrant Cty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160 (1993).]

In seeking to establish municipal liability in this case, plaintiff must confront the highly stringent standards for municipal liability arising from the U.S. Supreme Court's decision in *Monell v. Department of Soc. Svcs.,* 436 U.S. 658 (1978) and its progeny. It is, in this court's experience, exceedingly rare for a plaintiff to succeed in establishing municipal liability under *Monell* based on the actions of officers such as Deputy Smith and Captain French who do not serve as final policymakers for their municipal employers, and it concludes that this case is no different. It is well settled under *Monell* that municipalities are liable only for their own acts and

27

not those attributed to them by principles of *respondeat superior*. *Monell*, 436 U.S. at 690. A municipality can be held liable under § 1983 only if a municipal "official policy or custom" caused the deprivation of a constitutional right. *Spiller v. City of Texas City, Police Dep't,* 130 F.3d 162, 167 (5th Cir.1997).

In this case, it seems clear that Deputy Smith's alleged actions were not taken pursuant to any official county policy or custom, particularly since plaintiff herself emphasizes that "[u]nder the basic rules for canine officers, Tunica County's Canine Operation Policy 7.10 provides that an unsupervised K-9 is never permitted to run freely within the agency, at home, or in a public area." [Brief at 29]. In the court's view, there is tension between plaintiff's arguments, on the one hand, that Deputy Smith acted contrary to county policy in this case and her separate contention that Tunica County nevertheless faces liability under *Monell*.

In attempting to establish municipal liability in this case, plaintiff focuses primarily on allegations that the County exhibited deliberate indifference in its training and supervision of Deputy Smith. In electing to proceed under this path, however, plaintiff must surmount the highly stringent requirements of the U.S. Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). In *City of Canton*, the Supreme Court held that when a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure may, under certain limited circumstances, constitute an "official policy" that can support municipal liability if it "amounts to deliberate indifference." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018) (quoting *City of Canton*, 489 U.S. at 388).

Under the *City of Canton* framework, deliberate indifference based on a municipality's failure to properly train its employees may be proven in one of two ways. *Littell*, 894 F.3d at 624. First, "municipal employees will violate constitutional rights 'so often' that the factfinder

can infer from the pattern of violations that 'the need for further training must have been plainly obvious to the ... policymakers.' " *City of Canton*, 489 U.S. at 390 n.10. The Supreme Court has made it clear that establishing this proof of pattern is "ordinarily necessary" for § 1983 plaintiffs. *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382 (1997)).).

Absent proof of a pattern of prior constitutional violations, deliberate indifference can still be inferred in a limited set of cases, where "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, [can] trigger municipal liability." *Brown*, 520 U.S. at 409, 117 S.Ct. 1382 (citing *Canton*, 489 U.S. at 390, 109 S.Ct. 1197). This "single-incident" exception applies when "the risk of constitutional violations was or should have been an 'obvious' or 'highly predictable consequence' of the alleged training inadequacy." *Littell*, 894 F.3d at 624 (quoting *Brown*, 520 U.S. at 409, 117 S.Ct. 1382).

In her briefing, plaintiff essentially ignores the above authority, choosing instead to focus on the factual issue of whether or not Deputy Smith's K9 certification was current as of the date of the dog attack in this case. It appears to this court that the County has the better of the arguments on this issue and that Smith's certification was, in fact, current as of the date of the attack in this case. However, even if this court were to assume that fact issues exist in this regard, plaintiff would still have to demonstrate either 1) a pattern of prior violations by K9 officers in Tunica County or 2) that the "single-incident" exception to the required showing of such a pattern is present in this case. Once again, *City of Canton* requires that plaintiff make at least one of these two showings, and she may not survive summary judgment by simply "changing the subject" and raising arguments regarding whether Deputy Smith's certification was current or not.

29

Plaintiff's brief includes no arguments which even arguably establish that a pattern of prior violations by Tunica County K9 officers exists in this case, nor has she provided any basis for this court to conclude that the single-incident exception is applicable here. In so stating, this court notes that the U.S. Supreme Court has been extremely reluctant to find the single-incident exception applicable in a particular case, *see, e.g. Connick v. Thompson*, 563 U.S. 51, 55 (2011), and it sees no reason to suspect that this case would be any different. This court accordingly concludes that the County's motion to dismiss the § 1983 claims asserted against it (and against its deputies in their official capacities) are due to be granted.

### 6. Conclusion 6: Plaintiff's state law claims are due to be dismissed.

In her response to the motion for summary judgment, plaintiff has failed to address defendants' arguments that her state law claims, which are based on allegations of negligent hiring and supervision, are due to be dismissed pursuant to the discretionary functions exception set forth in the Mississippi Tort Claims Act (MTCA). *See* Miss. Code Ann. §11-46-9(1)(d). The Mississippi Supreme Court has held that "[t]he manner in which a police department supervises, disciplines and regulates its police officers is a discretionary function of the government," *City of Jackson v. Powell*, 917 So. 2d 59, 74 (Miss. 2005), and plaintiff has submitted no arguments contesting that this holding bars her state law claims in this case. Plaintiff's state law claims will therefore be dismissed.

In light of the foregoing, it is ordered that defendants' motion for summary judgment is granted in part and denied in part.

This 2nd day of January, 2023.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI